[No. 66236-3.   En Banc.]

Argued September 22, 1998.     Decided December 24, 1998.

LONNIE C. PHILLIPS, ET AL., *Respondents*, v. KING COUNTY, *Petitioner*, LOZIER HOMES, INC., *Respondent*.

MADSEN, J., concurs in the result only.

*Norm Maleng, Prosecuting Attorney,* and *Cassandra Newell* and *H. Kevin Wright, Deputies,* for petitioner.

*Law Offices of J. Richard Aramburu,* by *J. Richard Aramburu;* and *Hillis Clark Martin & Peterson,* by *Lynne M. Cohee,* for respondents.

*James R. Sweetser, Prosecuting Attorney for Spokane County,* and *Timothy M. Durkin, Deputy;* and *Lisette F. Carter* on behalf of Spokane County, amicus curiae.

*Karen A. Willie* on behalf of Washington Association of Municipal Attorneys, Association of Washington Cities, and the Cities of Tacoma, Everett, and Anacortes, amici curiae.

*Michael W. Gendler* on behalf of Washington Environmental Council, amicus curiae.

GUY, J. — This case involves review of an inverse condemnation cause of action brought by landowners against developers of neighboring property and King County for damages caused by surface waters which allegedly inundated their property. The question before us involves the possible basis for liability on the part of the County.

## FACTS

Plaintiffs in the action below, Lonnie and Gloria Phillips (hereafter Phillips), own five acres of property on the East Lake Sammamish plateau in King County, which they purchased in 1981. They built their home in the center of the property, leaving the remainder forested. They planned to subdivide and further develop their property in the future. To the west of the Phillips' property was a 19-acre parcel owned by Respondent Lozier Homes, Inc. (hereafter Lozier). Between the two parcels of property is a 60-foot-wide undeveloped county right-of-way which runs north and south and would be the southerly extension of 236th Avenue N.E. when developed.

In 1988, Lozier applied to King County for approval of a preliminary plat to build a 78-home residential housing development, to be called "Autumn Wind." In the application, Lozier proposed to construct drainage facilities to handle surface water runoff. The County issued a declaration of nonsignificance under the State Environmental Policy Act (SEPA), RCW 43.21C, and Lozier did not, therefore, have to prepare an environmental impact statement for the project. In 1989, the County approved the preliminary plat, conditioned on its subsequent approval of a surface water drainage plan. The report and recommendation to the King County Council from the Zoning and Subdivision Examiner included the fact that the development was located within a "Critical Drainage Basin" and that the eastern basin of the property had no defined conveyance system downstream and, therefore, the outlet from that basin "shall require special design consideration." Clerk's Papers at 645.

King County does not prepare or revise engineering drawings of the developer but reviews them for compliance with the codes and regulations that are in effect when the completed application is submitted. Since the application for the Autumn Wind project was submitted in 1988, the engineering plans for the development were reviewed pursuant to the 1979 Surface Water Design Manual. Although a new surface water drainage code was adopted by King County in 1990, it did not apply to the Autumn Wind project because the project was vested to the prior code pursuant to RCW 58.17.033.

Lozier's first engineering plans called for a storm drainage conveyance outlet at the southeast corner of the development to discharge into a drainage easement and ultimately a stream on an adjacent property (not the Phillips' property). After King County approved this design and after Lozier had constructed the storm water detention facilities, Lozier informed the County that it had been unable to obtain a drainage easement from the adjoining property owner. Lozier then submitted another drainage plan which is the subject of this lawsuit.

The changed drainage plan consisted of a combination of pipe and ditch to transport water from the detention facility (retention pond) to a flat dispersal trench, approximately 300 feet in length, purportedly designed to simulate the natural sheet flow condition currently existing for the drainage basin. Interceptor drains were also to be constructed at strategic locations in seepage zone areas. Lozier proposed that this system, known as a "sheet flow spreader," be built in the King County right-of-way. The County approved this change to the drainage plan and allowed Lozier to build the "spreaders" in the county owned right-of-way south of 236th Avenue N.E. The spreaders were built on the far east side of the right-of-way within one to five feet from the Phillips' property. Prior to final plat approval, Mr. Phillips contacted the County to complain about the spreaders in the right-of-way and about additional water flowing onto his property. The County

nevertheless gave final plat approval to the development in February 1993.

The sheet flow spreaders located in the county right-of-way are drainage ditches consisting of long trenches several feet deep filled with rock with a perforated pipe along the bottom. The record could support a finding that they were used to convey Autumn Wind storm water to the Phillips' property. The plan was for the water to either seep into the ground and/or to bubble up over the top of the ditch, out onto the surface and then flow onto adjacent properties. A letter from Lozier's engineers to Lozier before the ditches were approved states that "the outfall runoff from the project site will be collected in these trenches and dispersed into the ground. Additional runoff will sheet flow onto the property to the east" (the Phillips' property). Clerk's Papers at 308. The plan for the drainage system also shows that the "offsite area available for percolation" of water from the spreaders was on the Phillips' property. A letter from Lozier's engineers warned the developer in April 1992 that the proposed drainage system (vested under the old water code) could result in liability to other property owners. The engineers explained:

> Since several of the downstream neighbors have expressed concern to King County in the recent past, we have a situation especially prone to potential future litigation.
>
> There are really two major options available to you in light of the situation that we have with the neighbors and King County:
>
> 1. Make the minimum changes that will be accepted by King County for approval, and accept the inherent liability that comes with utilizing a standard that has been exceeded in the industry.
>
> 2. Add additional mitigation of a magnitude that would greatly limit future liability. The additional mitigation would need to be on par with what is currently being used in critical drainage basins. This would most likely involve the enlargement of the existing pond three or four fold. Several lots would be lost to this pond enlargement.

We are proceeding with our negotiations with King County assuming that you will want to make only the minimum changes necessary to get the plans approved and that you are prepared to accept the increased liability that may accompany that choice. If you want us to consider other additional modifications to the design, please let me know and we can discuss what would be involved.

Clerk's Papers at 305-06. Apparently Lozier chose to make only the minimum changes acceptable to the County and not to meet the standards set by the more modern surface water code. From the record before us, it appears that letter was sent to the developer only and was not sent to the County.

David Lozier's declaration indicates that in the plat, Lozier dedicated all of Autumn Wind's road and drainage facilities, including the detention pond and sheet flow spreaders, to King County. The plat was recorded February 2, 1993. However, a declaration of Steven Townsend, a supervising engineer for King County, states that as of April 7, 1995, the County had not yet given final construction approval, or assumed maintenance responsibility, for the Autumn Wind drainage facilities and that they were still being maintained by Lozier.[1] It appears that at the time the trial court granted summary judgment in favor of the County, the drainage system was still maintained by Lozier.

The Phillips' hydrology expert, Keith Malcolm Leytham, testified by deposition that the water from the impervious surfaces in the Autumn Wind development were connected to a storm drain system and discharged into the detention pond. Mr. Leytham testified that the volume of water on the Phillips' land had doubled and the rate of flow had

---

[1]The King County Code in effect at the time of the Autumn Wind project provided that "Maintenance of all drainage facilities constructed or modified by a project is the responsibility of the property owner as described in the Surface Water Design Manual, except King County performs maintenance of drainage facilities constructed for formal plat subdivisions and some short plat subdivisions, two years after final plat recording following an inspection by the department." Clerk's Papers at 314.

increased by five times the previous pre-development water flow. He stated that approximately 25 percent of the Phillips' land west of their house had standing or flowing water of an inch to two feet deep and that there was standing water right up to his driveway and flowing water within 20 feet of the Phillips' house. Mr. Leytham concluded that the water on the Phillips' property was coming from the Autumn Wind property via the spreaders located in the county right-of-way. Mr. Leytham concluded that the detention pond did not function as intended; that the development has resulted in substantially increasing flows onto the Phillips' property; and that at least certain portions of the storm drainage system on the property probably were designed incorrectly. Mr. Leytham agreed with the County that the Lozier drainage system did seem to conform with the King County 1979 Surface Water Design Manual.

In 1993, the Phillips commenced this lawsuit, claiming that their land, once generally dry, was now flooded and partially unusable. The Phillips alleged that the effect of drainage plans of developer Lozier, as approved by King County, was to collect storm waters from the Autumn Wind plat in artificial drainage facilities and to cast them in a body onto their land. The Phillips also alleged that the County had specifically allowed these drainage facilities to be built in the county right-of-way immediately adjacent to their property. Photographs in the record support the allegation that the Phillips' land is inundated with surface water. The Phillips' complaint against Lozier and King County states several causes of action, including: (1) illegal dispersal of drainage waters, (2) inverse condemnation and trespass; (3) improper elimination of access to plaintiffs' property; (4) appropriation of a private ditch or drainage way; and (5) failure to comply with SEPA. Lozier and the County argued that the Phillips were barred from litigating these issues based on the doctrine of administrative exhaustion. Following discovery, both Lozier and King County moved for summary judgment. The trial court granted both motions and all causes of action were

dismissed as to both the County and Lozier. The Phillips appealed.

The Court of Appeals reversed the part of the summary judgment which had dismissed the negligence claim against Lozier and reversed the grant of summary judgment which had dismissed the inverse condemnation and trespass claims against the County. *Phillips v. King County*, 87 Wn. App. 468, 472, 943 P.2d 306 (1997), *review granted in part and denied in part*, 134 Wn.2d 1019 (1998). It affirmed the dismissal of the other causes of action against Lozier and the County. Lozier did not seek further review, hence the negligence action against it may proceed.

King County sought review in this Court of the inverse condemnation and trespass issues. The Phillips asked that, if review were granted, the Court also review the dismissal of the negligence action against the County on public duty doctrine grounds and the dismissal of the private inverse condemnation cause of action against the developer, Lozier. We granted review of King County's petition but denied review of the issues raised by the Phillips. Therefore, the only issue before us is the legality of the reinstatement of the inverse condemnation and trespass claims against King County.[2] We accepted amicus briefing from the Cities of Tacoma, Everett, Anacortes, the Washington Association of Municipal Attorneys, the Association of Washington Cities, Spokane County, the Washington Environmental Council, and Bricklin and Gendler, LLP.

## ISSUE

Did the Court of Appeals err in holding that a cause of action for inverse condemnation can proceed against a

---

[2]The SEPA issue was abandoned by the Phillips in the Court of Appeals. The Phillips have not pursued the issue regarding infringement of their alleged pre-existing easement for access by way of the county right-of-way after the Court of Appeals held that the issue was not yet ripe. The County's proffered defense of the Phillips' failure to exhaust administrative remedies has been abandoned by the County after the Court of Appeals decision. Hence, these issues are not before us.

county based on any of the following: (1) the county's approval of a private land development, or (2) a county's agreement to accept ownership in order to maintain a storm drainage system, or (3) a county's allowance of a private drainage system to be built on its property?

## ANALYSIS
### Standard of Review

This appeal arises out of an order granting summary judgment and this Court therefore engages in the same inquiry as the trial court, which is to consider all facts submitted as contained in the record and reasonable inferences therefrom in favor of the nonmoving party. We therefore consider all facts and reasonable inferences in favor of the Phillips for the purpose of our review. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c); *Meaney v. Dodd*, 111 Wn.2d 174, 177-78, 759 P.2d 455 (1988).

### Inverse Condemnation Actions and Surface Water Drainage

██ Recovery for the taking or damaging of land by the government is provided for in the Washington Constitution, which states: "No private property shall be taken or damaged for public or private use without just compensation having been first made." CONST. art. I, § 16 (amend. 9).[3] The measure of damage in a taking case is the diminution in the fair market value of the property caused by the

---

[3]The power of eminent domain is inherent in the State; the State Constitution, rather than granting this right, imposes limitations on the State's inherent power. *Kincaid v. City of Seattle*, 74 Wash. 617, 621, 134 P. 504, 135 P. 820 (1913). The State can only take or damage private property for a public use and must provide the property owner with reasonable compensation. *Kincaid*, 74 Wash. at 622. The Constitution contains a broad, general prohibition against taking of private property for private use. A narrow exception allows private condemnation

governmental taking or damaging. *Petersen v. Port of Seattle*, 94 Wn.2d 479, 482, 618 P.2d 67 (1980); *Hoover v. Pierce County*, 79 Wn. App. 427, 431, 903 P.2d 464 (1995).

■■ The County argues that the Court of Appeals erred in reinstating the Phillips' inverse condemnation cause of action. The term "inverse condemnation" is used to describe an action alleging a governmental "taking," brought to recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain. *Lambier v. City of Kennewick*, 56 Wn. App. 275, 279, 783 P.2d 596 (1989) (quoting *Martin v. Port of Seattle*, 64 Wn.2d 309, 310 n.1, 391 P.2d 540 (1964)). A party alleging inverse condemnation must establish the following elements: (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings. *Pierce v. Northeast Lake Wash. Sewer & Water Dist.*, 69 Wn. App. 76, 79, 847 P.2d 932 (1993); *Rains v. Department of Fisheries*, 89 Wn.2d 740, 748, 575 P.2d 1057 (1978) (Wright, C.J., dissenting).

■■ In *Buxel v. King County*, 60 Wn.2d 404, 409, 374 P.2d 250 (1962), we held that in certain situations a county can be liable for the damages caused by the trespass of surface water across a plaintiff's land, accomplishing thereby a taking of that property without compensation.[4] Surface water is defined as vagrant or diffuse water

---

for private ways of necessity and drains. CONST. art. I, § 16 (amend. 9). This narrow exception for private condemnation is not at issue in this case.

[4]The Phillips do not argue the trespass cause of action separately from their action for inverse condemnation. We understand their argument to be that the trespass of water effected a taking or damaging of their property prohibited by the State Constitution. A trespass is an intrusion onto the property of another that interferes with the other's right to exclusive possession. *Hedlund v. White*, 67 Wn. App. 409, 418 n.12, 836 P.2d 250 (1992). The concept includes a trespass by water. *Buxel v. King County*, 60 Wn.2d 404, 409, 374 P.2d 250 (1962). *See also Bradley v. American Smelting & Ref. Co.*, 104 Wn.2d 677, 709 P.2d 782 (1985). A trespass differs from a taking in that to constitute a taking, the intrusion must be chronic and not merely a temporary interference which is unlikely to recur. *Lambier v. City of Kennewick*, 56 Wn. App. 275, 283, 783 P.2d 596 (1989) (citing *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987); *Northern Pac. Ry. v. Sunnyside Valley Irrigation Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975)). Additionally, the remedy for the trespass may be different; the remedy for a taking

produced by rain, melting snow or springs. *King County v. Boeing Co.*, 62 Wn.2d 545, 550, 384 P.2d 122 (1963). In *Boeing*, we reiterated that liability arises if surface water is artificially collected and discharged on surrounding properties in a manner different from the natural flow of water onto those properties. *Boeing*, 62 Wn.2d at 550-51. Generally, municipal rights and liabilities as to surface waters are the same as those of private landowners within the city. 18A EUGENE MCQUILLIN, LAW OF MUNICIPAL CORPORATIONS § 53.140, at 307 (James Perkowitz-Solheim et al. eds., 3d ed. rev. vol. 1993).

In *Wilber Dev. Corp. v. Les Rowland Constr., Inc.*, 83 Wn.2d 871, 874-75, 523 P.2d 186 (1974), we explained:

> A municipality ordinarily is not liable for consequential damages occurring when it increases the flow of surface water onto an owner's property if the damages arise wholly from changes in the character of the surface produced by the opening of streets, building of houses, and the like, in the ordinary and regular course of the expansion of the municipality. On the other hand, it is liable if, in the course of an authorized construction, it collects surface water by an artificial channel or in large quantities and pours it, in a body, upon the land of a private person, to his injury. Under this rule, while municipal authorities may pave and grade streets and are not ordinarily liable for an increase in surface water naturally falling on the land of a private owner where the work is properly done, they are not permitted to concentrate and gather such water into artificial drains or channels and throw it on the land of an individual owner in such manner and volume as to cause substantial injury to such land and without making adequate provision for its proper outflow, unless compensation is made. 18 E. McQuillin, *Municipal Corporations* § 53.144, at 538 (3d ed. rev. 1963). Surface waters may not be artificially collected and discharged upon adjoining lands in quantities greater than or in a manner different from the natural flow thereof. At the same time, it is the rule that the flow of surface water along natural drains may be hastened or incidentally increased by artificial means, so long as the water is not

is the difference in market value, while the remedy for a trespass may be an injunction. *Compare Petersen v. Port of Seattle*, 94 Wn.2d 479, 482, 618 P.2d 67 (1980), *with Hedlund*, 67 Wn. App. at 418.

ultimately diverted from its natural flow onto the property of another.

(Citations omitted.)

We concluded that if water is "collected and deposited upon the land in a different manner" than before development, the property owner may be entitled to damages. *Wilber*, 83 Wn.2d at 876. Many more recent cases have followed these rules and allowed damages when a municipality itself acts to collect surface water and channels it onto private property. *E.g., Burton v. Douglas County*, 14 Wn. App. 151, 539 P.2d 97 (1975); *Hoover v. Pierce County*, 79 Wn. App. 427, 903 P.2d 464 (1995). In *DiBlasi v. City of Seattle*, 136 Wn.2d 865, 969 P.2d 10 (1998), we recently held that there may be liability on the part of a city for damages caused by water from a city street if the street acted to collect, concentrate and channel surface water onto private property in a manner different than the natural flow. *DiBlasi*, 136 Wn.2d at 879.

While the law on liability for damages caused by surface waters may be difficult to apply, it is fairly settled law. However, the application of the law to the facts of this case is highly disputed. The County (and amici that agree with the County's position) argue that the County only acted to approve the development of private property under the laws and regulations under which the developers were vested. The municipalities argue that they must take or damage property, and not simply issue permits to a developer, in order to be liable for damages caused by surface waters. The County insists the development was entirely a private one and that an inverse condemnation action will not lie where there is no public project and no construction or other affirmative action by the County.

We read the County's and amici's arguments as responding to the Court of Appeals decision which held that a municipality's mere approval of a private developer's drainage plan can accomplish a constitutional taking. *Phillips*, 87 Wn. App. at 485-86. Additionally, the Court of Appeals

reinstated the inverse condemnation action against the County based on the fact that the County assumed ownership and maintenance of the drainage system after construction was completed, reasoning that the system "is now a public facility." *Phillips*, 87 Wn. App. at 486. The Phillips argue that the County's liability is based on the fact that the County required that the developer deed all of the drainage facilities to the County following final plat approval and the fact that the County let the developer build the drainage facilities in the county right-of-way. While we do affirm the ultimate decision of the Court of Appeals, we do so on different grounds.

This case appears complex when viewed as one issue but is more understandable (and will be a more useful explanation of the law) when viewed as a series of questions. First, if the only action taken by a county or city is to approve a private development plan under existing regulations, is the municipality liable if the drainage system is inadequate and causes damage to other landowners? Second, does the fact that a city or county accepts ownership of a storm drainage system built by a private developer in order to guarantee perpetual maintenance make the municipality liable for damages that result from the design of the drainage facilities? Third, if the municipality participates in development of the drainage facilities by allowing drainage to be built on previously owned or controlled public property, does that voluntary affirmative action give rise to liability in inverse condemnation when an adjacent landowner's property is damaged? We address each question separately.

### County's Approval of Private Development as a Basis of Liability

■ The County and various amici argue that the Court of Appeals decision improperly equates King County's approval of private development with liability for a public project. We agree. If all that the County had done was to approve private development, then one of the elements of

an inverse condemnation claim, that the government has damaged the Phillips' property for a public purpose, would be missing. There is no public aspect when the County's only action is to approve a private development under then existing regulations. Furthermore, the effect of such automatic liability would have a completely unfair result. If the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties.

One of our older opinions has caused some confusion on this issue. The Court of Appeals in the present case read our decision in *Wilber Dev. Corp.*, 83 Wn.2d 871, as holding that approval alone can give rise to a taking. The Court of Appeals stated:

> Although the *Wilber* court did not directly hold that a municipality by the mere approval of a private developer's drainage plan accomplishes a constitutional taking, such a holding would appear to be implicit in the ruling.

*Phillips*, 87 Wn. App. at 485. While we understand why *Wilber* has caused this confusion, we disagree with this reading of the case. The *Wilber* case was an inverse condemnation action brought by a landowner whose property was allegedly damaged by surface water. While the Court in *Wilber* did reverse a summary judgment in favor of the town and county, the Court did not discuss the question of what action by the town or county gave rise to liability. The Court did point out that the town controlled the flow of water from a natural watercourse that flowed on the plaintiff's land. While we understand that the *Wilber* case could be read to hold that a municipality's mere approval of private development could give rise to liability on the part of the governmental entity, we take this opportunity to clarify the opinion. The municipality's liability was predicated on its involvement in the project and not simply on its approval of development. To the extent the

*Wilber* case can be read to hold that approval of development alone is sufficient to give rise to liability on the part of a municipality, we overrule it.

In a recent case from the Court of Appeals, the Court addressed the issue whether approval of development can give rise to an inverse condemnation claim. In *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 871 P.2d 601 (1994), landowners sued the county and the developer of a residential subdivision, seeking recovery for damage to their property allegedly caused by excessive runoff of surface water from the development. In *Pepper*, the county had approved short plats for development, including the drainage facilities, and had accepted the road and drainage systems for county maintenance after final approval. The plaintiffs argued that in failing to enforce its own ordinances, the county took or caused damage to their property without just compensation. The Court of Appeals held that liability for inverse condemnation may exist "where the alleged taking or damage was caused by affirmative action of a government entity, *i.e.*, appropriating the land, restricting its use through regulation, or causing damage by constructing a public project to achieve a public purpose." *Pepper*, 73 Wn. App. at 530. The Court dismissed the action against the county, reasoning:

> Here, the damages to the [plaintiffs'] properties were not the result of the County appropriating or regulating their use of the land. There was no allegation that [the development] was a government project, or that King County affirmatively participated in any way. The fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project. Since [the development] was not a public project, the County did not appropriate [the plaintiffs'] land, and land use regulation of their property did not cause the damages, no inverse condemnation was involved.

*Pepper*, 73 Wn. App. at 531. We agree with the *Pepper* Court that county action in regulating development and enforcing drainage restrictions should not give rise to liability against the county for the negligence of a developer.

Our conclusion on this issue comports with the practical realities of the vested rights doctrine. At common law, the vested rights doctrine in Washington entitled developers to have a land development proposal processed under the regulations in effect at the time a complete building permit application was filed. Not until 1987 did the Legislature enlarge the vesting doctrine to also apply to subdivisions. *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997). Under current law, as required by the subdivision statute, RCW 58.17.033, a subdivision application is reviewed under the codes, ordinances and regulations in effect at the time a complete application for preliminary approval is filed. *See Noble Manor*, 133 Wn.2d 269. Since the application for the Autumn Wind project was submitted in 1988, the plans for the development were reviewed pursuant to the 1979 Surface Water Design Manual. As noted above, a new surface water drainage code was adopted by King County in 1990, but it did not apply to the Autumn Wind project because the project was vested to the prior code under RCW 58.17.033. Therefore, developer Lozier had to decide whether to meet only the requirements of the older code or whether to exceed its requirements and meet the modern criteria. While Lozier could have exceeded the code requirements, absent some SEPA consideration,[5] the County was bound by the vested rights rules to apply the requirements of the code in effect at the time of the project's application. In light of this doctrine, we reject the contention that a municipality will be liable for a developer's design which causes damages to neighbors when the county's only actions are in approval and permitting.

▇ This Court's modern articulation of the public duty doctrine as it applies to land use regulation also militates against finding municipal liability based only on approval of private development. The public duty doctrine has been interpreted by this Court to specifically preclude claims based on a municipality's approval of private development.

---

[5]The vesting statute does not abrogate the requirements of SEPA. RCW 58.17.033(3).

*Taylor v. Stevens County*, 111 Wn.2d 159, 164-65, 759 P.2d 447 (1988). In *Taylor*, the purchasers of a home sued the county for negligently issuing a building permit for a house which turned out to have violations of the building code. We held that the county was not liable and rejected the contention that building codes impose a duty on local governments to enforce the provisions of such codes for the benefit of individuals. We explained that building codes, the issuance of building permits, and building inspections are devices used to secure to local government the consistent compliance with zoning and other land use regulations and code provisions governing the design and structure of buildings. *Taylor*, 111 Wn.2d at 164. In *Taylor*, we explained that building permits and building code inspections only authorize construction to proceed; they do not guarantee that all provisions of all applicable codes have been complied with. Allowing an eminent domain cause of action based solely on a municipality's approval of private development, where the developer acts negligently and the municipality is not actively involved in the project, would be an end-run around this Court's law on the public duty doctrine.

The Phillips' reliance on *Conger v. Pierce County*, 116 Wash. 27, 198 P. 377, 18 A.L.R. 393 (1921) is misplaced. While that opinion did say that "[t]he state itself cannot take or damage private property for a public use, without compensating the owner; nor can it authorize a taking or damaging which is prohibited to it," 116 Wash. at 35, the *Conger* Court was referring to legislation that authorized local governments to do construction work on the Puyallup River. The Court held only that the State could not authorize the counties to do work on the river which took or damaged private property. The "authorization" referred to was the authorization from the Legislature to the counties to engage in construction. The cases on which the Phillips rely for the proposition that a municipality is liable for diverting surface water onto private property involve situations where the municipality was the actor. The reliance on regulatory takings cases is inapposite. While a governmental entity can "take" property when regulation "goes too

far," the County did not regulate the use of the Phillips' property in this case.

■ The question of when legal liability attaches to one's acts is a policy question, and legal liability is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. *Rains*, 89 Wn.2d at 743-44. A governmental entity does not become a surety for every governmental enterprise involving an element of risk. *Bodin v. City of Stanwood*, 130 Wn.2d 726, 740, 927 P.2d 240 (1996). Mere approval of a private developer's plans does not give rise to an action for inverse condemnation.

### County's Acceptance of Ownership and Maintenance

■ ■ King County represents that in accordance with long standing policy, and pursuant to King County Code 9.04.050, King County routinely accepts ownership of residential drainage systems, along with the roads, in all residential subdivisions. This is done to ensure that roads and residential drainage systems are properly maintained. Amici, Cities of Tacoma, Everett, and Anacortes, and Washington Association of Municipal Attorneys and Association of Washington Cities, explain that many municipalities in Washington accept private storm water facilities for maintenance or ownership after they are constructed in connection with a new development. This occurs because homeowner associations or other private owners do not have the funds or motivation to do necessary maintenance to keep the drainage facilities operating at their maximum efficiency. If storm water facilities become clogged or overgrown, their efficiency is affected and flooding would occur in smaller storms. During flood emergencies, municipal funds were often spent to clean ponds on private property and ameliorate the flooding because streets and public safety were involved. Amici explain that many municipalities took a proactive position and elected to take over the maintenance of the privately constructed facilities rather than pay for the emergency response when the facilities

failed. Amici argue that a finding of liability against King County is especially disconcerting because of its far-reaching, proactive role in storm water control. They assert that the current King County Surface Water Design Manual is the industry leader in innovative design and environmentally protective storm water engineering and that it was available to this developer. Amici argue that the developer apparently chose to comply only with the 1979 manual to which it was vested.

The County and amici cities argue they should not be liable for a design defect in a developer's system simply because they accept the system after construction in order to provide proper maintenance in the future. We agree. To have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss. *Lambier*, 56 Wn. App. at 283 n.4; *Peterson v. King County*, 41 Wn.2d 907, 252 P.2d 797 (1953); *see also Gaines v. Pierce County*, 66 Wn. App. 715, 726, 834 P.2d 631 (1992) (governmental conduct that is not a cause of damage to plaintiff cannot constitute a "taking" for purposes of inverse condemnation).

It may be that in some factual situations there could be liability on the part of a county for failure to maintain a public drainage system. *Sigurdson v. City of Seattle*, 48 Wn.2d 155, 162, 292 P.2d 214 (1956); *see also Peterson*, 41 Wn.2d at 915. However, there is no allegation in this case that lack of proper maintenance caused the damages. The only allegation is that design, not maintenance, caused the problems. The record shows that the County had not yet even accepted the system for maintenance at the time the trial court granted summary judgment to the County. It is factually impossible for lack of maintenance by the County to have been the cause of the damages alleged by the Phillips.

We conclude the Court of Appeals finding of municipal liability based on the County's acceptance of the Autumn Wind drainage system is incorrect. No failure of the County's maintenance responsibilities is even alleged and

hence is not the cause of the damage to the Phillips' property.

## Drainage System Constructed on Public Land

It is undisputed that King County provided the land on which the spreaders were placed. Whether the County owned the property in fee or whether it allowed Lozier to build the drainage system in the county's right-of-way is irrelevant. The record shows that the County allowed Lozier to build drain pipes across its 236th Avenue N.E. right-of-way and to install the spreader system on the far east side of the right-of-way, within several feet of the Phillips' property.

■■ ■■ The County acted as a direct participant in allowing its land, or land over which it had control, to be used by the developer. Rather than acting only to approve plans, the County here used its own property for the specific placement of drainage devices allegedly intended to drain water onto the Phillips' property. It is alleged that the County voluntarily allowed its property to be used as a conduit for storm water from private development. The record indicates that the water was collected from the development into the retention pond and was piped by culvert under or across the county right-of-way so that instead of flooding county property, it poured out of the spreaders onto the Phillips' property. This alleged conduct, of allowing the use of public land to convey the subdivision's storm water to the edge of, and then upon, the Phillips' property, satisfies the public use element of an inverse condemnation cause of action. King County's decision that the 236th Avenue N.E. right-of-way should be used for the construction of drainage fixtures was a proprietary action respecting a government's management of its public land. By channeling the water to the edge of its right-of-way, the County acted to protect its interest in public land. As in the *Wilber* case, the County's action here was not simply approval and permitting—it was actual involvement in the

drainage project. If it is proven at trial that the County participated in creation of the problem, it may participate in the solution.

If the only action by the County had been to approve the drainage system under the regulations to which the developer was vested and to take over control and maintenance of the storm drainage system, as it apparently usually does, then there would be no cause of action against the County. However, the use of county controlled property for the building of part of the drainage system for the conduit of the water may give rise to liability on the part of the County. As discussed above, a long line of Washington cases holds that a municipality may not collect surface water by an artificial channel, or in large quantities, and pour it, in a body, on the land of a private person, to his or her injury. *See, e.g., DiBlasi*, 136 Wn.2d 865; 18A McQUILLIN, *supra*, § 53.144, at 321-23.

The County's argument that the record is devoid of facts sufficient to support a finding of a causal connection between the alleged damage and the location of the spreaders in the right-of-way is inaccurate. The expert hydrologist testified that the spreaders, while ineffective to allow the water to infiltrate into the ground, did act to channel water from the detention pond to the Phillips' property. On summary judgment, any doubt as to the issue of a material fact is resolved against the moving party; we consider all facts submitted and the reasonable inferences therefrom in the light most favorable to the nonmoving party. *Atherton Condominium Apartment Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

Under the vested rights doctrine, the County properly considered the developer's application under the 1979 Surface Water Design Manual. However, the vested rights doctrine did not force the County to provide public land to further the private development. This is not a case where the County simply acted to approve a developer's plans or to allow runoff water to pour into the public drainage system, but rather one in which the County used its own

property for the specific placement of drainage devices which allegedly drained onto the Phillips' property. By making public property available for the building of the drainage facilities, the County may share in any potential liability, along with the developer, for damage to the Phillips' property caused by the dispersal of water from the spreaders.

## CONCLUSION

We conclude the Phillips have raised a material dispute of fact whether the spreaders which were built in the county right-of-way acted to channel surface water from the Autumn Wind development onto the Phillips' land and caused damage. The deposition testimony of the Phillips' expert witness and the declaration of Mr. Phillips indicate the water was collected in the detention pond and channeled by pipe and drain to the spreaders which poured water onto the Phillips' land.

We affirm the Court of Appeals, but on a different basis. We hold that approval by a county for private development does not give rise to liability in inverse condemnation for damages caused by a design defect in the developer's drainage system. We hold that a county's acceptance of a drainage system for maintenance does not give rise to liability based on the developer's obsolete design. However, we hold that a county which allows a private developer to construct a drainage facility on public land, or land subject to public control, which acts to channel surface water onto adjacent property, may be liable in inverse condemnation if the plaintiff can prove liability under existing law regarding dispersal of surface waters and consequent damages.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.

MADSEN, J., concurs in the result.